UNITED STATES of America, Plaintiff-Appellant,

v.

Frank D. STANLEY and Mario Gonzalez-Garcia, Defendants-Appellees.

UNITED STATES of America, Plaintiff-Appellant,

v.

The O/S NATIONAL, her engines, tackle, appurtenances, etc., in rem, Defendant,

Frank D. Stanley, Claimant-Appellee.

Nos. 76–1947, 76–2136.

United States Court of Appeals, Ninth Circuit.

Nov. 5, 1976.

Rehearing and Rehearing En Banc Denied Dec. 20, 1976.

---

17. In view of this conclusion, it is unnecessary to consider other questions raised by the respective parties.

Billie A. Rosen, Atty. (argued), Washington, D. C., Dennis Michael Nerney, Asst. U. S. Atty., San Francisco, Cal., for plaintiff-appellant.

William Pinkus (argued), of Abbott & Pinkus, Mill Valley, Cal., James H. Newhouse (argued), of Cooper, Newhouse, Hertz, & Lyons, Berkeley, Cal., for Frank Stanley and Mario Gonzalez-Garcia.

Before LAY,* WRIGHT and KILKENNY, Circuit Judges.

---

\* Honorable Donald P. Lay, United States Circuit Judge of the Eighth Circuit, sitting by designation.

EUGENE A. WRIGHT, Circuit Judge:

The government appeals both the district court's grant of defendants' motion to suppress all evidence seized in a warrantless search of The O/S National and the entry of a judgment of non-forfeiture. Defendants were charged with importation of marijuana,[1] possession with intent to distribute, conspiracy to import, and conspiracy to possess with intent to distribute, in violation of 21 U.S.C. §§ 952(a), 841(a)(1), 963, and 846. Approximately 11,000 pounds of marijuana were found aboard the vessel and its forfeiture and condemnation were requested by the government under the provisions of 21 U.S.C. § 881(a)(4) and 49 U.S.C. § 782. The criminal and civil cases were consolidated for appeal.

## I.

### FACTS

On February 6, 1976, a Sonoma County deputy sheriff was called to the dock area of the Harbor Fish Company, Bodega Bay, California, where he observed a two-ton U–Haul rental truck with its right rear wheels broken through the pier. The driver told the officer that he was waiting for a fishing vessel to drop off some crab pots to be delivered to Eureka, California. The dock manager testified that tire tracks and a broken plank indicated that the truck had backed all the way down the pier to the loading area. This was denied by the driver. The driver then departed to obtain a hydraulic jack to free the truck.

After the driver left, the deputy noticed marijuana debris near the rear of the truck, inside it, and near the end of the pier by the water. He learned from local fishermen that two foreign boats (one well-known in Bodega Bay) and three local boats had left the harbor that morning, passing by the Harbor Fish Company pier as they were outbound. The less well-known foreign boat, The O/S National, was rigged for

1. Marijuana is a controlled substance within the meaning of 21 U.S.C. §§ 812 and 881(a)(1).

albacore fishing, then available only in southern California or Mexican waters.

Suspicious that illegal activity was afoot, the deputy phoned the Coast Guard, requesting apprehension of The O/S National. The National was first seen about nine miles from the coastline and was boarded 40 minutes later by Customs Patrol and Coast Guard personnel. Marijuana was found in the hold. The defendants were arrested and The National seized.

The district court determined that (1) there was insufficient probable cause to support a warrantless search, (2) there was insufficient evidence to warrant a finding that The O/S National had recently sailed from Mexican waters so as to sustain the action as a border search, and (3) because there was no probable cause and no border search, the search could not be sustained as a customs search pursuant to 19 U.S.C. § 1581(a).

## II.

### PROBABLE CAUSE

■ As a fundamental rule, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." (Footnotes omitted.) *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). One such exception is the finding of probable cause coupled with exigent circumstances. In this case, our holding as to probable cause makes it unnecessary to reach the issue of exigent circumstances.

"As a matter of routine practice, this circuit recites and evaluates primary evidence whenever reviewing a question of probable cause in a criminal case." *United States v. One Twin Engine Beech Airplane*, 533 F.2d 1106, 1108 (9th Cir. 1976).

The O/S National had entered the harbor after midnight on the morning of the 6th and, as previously noted, was one of several vessels proceeding out of the channel early that morning. The trial judge found that it was seen leaving the harbor from the direction that *any* vessel would have come when heading out to sea. He also noted that the rigging of O/S National was not so unusual as to trigger a connection with Mexico or contraband. In fact, it was rigged in the same manner as were 60% of the vessels berthed in Bodega Bay.

■ What was missing was a connection between The O/S National and the site of the marijuana transfer. In *United States v. Bates*, 533 F.2d 466 (9th Cir. 1976), probable cause was found where defendant had twice driven to and left a known smuggling area where the modus operandi was the picking up of smuggled goods by car. In *United States v. One Twin Engine Beech Airplane*, 533 F.2d 1106 (9th Cir. 1976), an informer had witnessed the defendant airplane land in Mexico on a semi-deserted road which was temporarily blockaded while the plane accepted some packages and then took off.

In the instant case, no vessel was actually seen near the Harbor Fish Company pier at the approximate time of the alleged transfer. The mere fact that The O/S National was a relatively unknown vessel in the area and had passed by the pier as it left the harbor is insufficient to support a reasonable belief that it was connected with the crime. The district court's finding of no probable cause was correct.

## III.

### CUSTOMS SEARCH

From 1789 when the first border search statute was enacted,[2] customs officials have been authorized to stop and examine incoming persons or baggage on suspicion that merchandise is concealed which is subject to duty or cannot be legally imported into the United States. Today there is similar legislative authority for boarding and searching vessels by Customs and the Coast Guard. 19 U.S.C. § 1581(a) provides:

2. Act of July 31, 1789, ch. 5, 1 Stat. 29, 43 (1789).

Any officer of the customs[3] may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters . . . and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle and use all necessary force to compel compliance.[4] [Footnotes added.]

The first issue is whether a customs search may be predicated on 19 U.S.C. § 1581(a) alone. As the court in *United States v. Weil*, 432 F.2d 1320 (9th Cir. 1970), *cert. denied* 401 U.S. 947, 91 S.Ct. 933, 28 L.Ed.2d 230 (1971), noted in construing 19 U.S.C. § 482, a related statute:

> In order to avoid conflict between this statute and the Fourth Amendment, the statutory language has been restricted by the courts to "border searches." We must remember, however, that the phrase "border search" does not appear in either the statute or the Constitution. It is merely the courts' shorthand way of defining the limitation that the Fourth Amendment imposes upon the right of customs agents to search without probable cause.

*Id.* at 1323.

Consistent with this, the Court in *Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2585, 37 L.Ed.2d 596 (1973), teaches that an act of Congress cannot validate searches which offend Fourth Amendment standards. *Id.* at 272, 93 S.Ct. 2585. In that case the government sought to justify a warrantless auto search 25 miles north of the Mexican border solely on the basis of § 287(a)(3) of the Immigration and Nationality Act [8 U.S.C. § 1357(a)(3)], pro-viding for warrantless searches of automobiles and other conveyances "within a reasonable distance from any external boundary of the United States."[5] The Court held the search unconstitutional, stating:

> In the absence of probable cause or consent, that search violated the petitioner's Fourth Amendment right to be free of "unreasonable searches and seizures."
>
> It is not enough to argue, as does the Government, that the problem of deterring unlawful entry by aliens across long expanses of national boundaries is a serious one. The needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards.

413 U.S. at 273, 93 S.Ct. at 2540.

By analogy, a search based solely on 19 U.S.C. § 1581(a) is unreasonable if it sweeps more broadly than the Fourth Amendment allows. In the absence of probable cause or consent, it is unreasonable unless it falls within an exception to the Fourth Amendment prohibition against unreasonable searches and seizures. A border search has been held to be such an exception. *United States v. Tilton*, 534 F.2d 1363, 1364 (9th Cir. 1976); *United States v. Solmes*, 527 F.2d 1370 (9th Cir. 1975); *United States v. Ingham*, 502 F.2d 1287 (5th Cir. 1974); *Klein v. United States*, 472 F.2d 847 (9th Cir. 1973).

In these cases a valid border was identified and a search undertaken on the basis of customs laws. In all the cases, however, the defendants were crossing the border while coming *into* the United States. No case has been found where the constitutionality of a search was premised on the bor-

---

3. Both Customs Patrol Officers and Coast Guard personnel are deemed "officers of the customs." 19 U.S.C. § 1401(i) (Supp.1976).

4. 19 U.S.C. § 1401(j) (Supp.1976) defines customs waters to be those within 12 miles (four leagues) of the United States coast. 19 C.F.R. 162.63 declares that searches under the Controlled Substances Act, 21 U.S.C. §§ 801 *et seq.*, and the Controlled Substances Import and Export Act, 21 U.S.C. §§ 951 *et seq.* are to be handled in the same manner as other customs searches.

5. The Attorney General's regulation 8 C.F.R. § 287.1(a)(2) defined "reasonable distance" as "within 100 air miles from any external boundary of the United States."

der search exception in the context of one being stopped and searched while leaving the United States. That is the situation presented here.

■ It is clearly established that a *border* was crossed. Courts have held that the crossing of the international border three miles from the United States coast and *entry* into territorial waters justifies a valid border search. *United States v. Tilton, supra* at 1366; *United States v. Hill*, 430 F.2d 129, 131 (5th Cir. 1970).[6]

Whether crossing the border *leaving* territorial waters should be treated as a typical border search opportunity, in the absence of a definitive ruling one way or the other, can be determined by comparing the justifications for the two types of border crossings, incoming and outgoing.

■ Border searches are not repugnant *per se*. The original customs statute exempting border searches of incoming vehicles and persons from the requirements of probable cause was passed by the same First Congress which proposed the Bill of Rights. The Supreme Court has argued that this demonstrates the validity of the present border search exemption. *Boyd v. United States*, 116 U.S. 616, 623, 6 S.Ct. 524, 29 L.Ed. 746 (1886).

Diverse policy interests also underlie the exception. The purpose behind border searches has been variously phrased as the need to stem the "flow of illegal aliens" into the United States, *United States v. Martinez-Fuerte*, —— U.S. ——, ——, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); to "prevent importation of contraband or of undeclared . . . merchandise," *United States v. Weil*, 432 F.2d 1320, 1323 (9th Cir.

1970); and to "search . . . newly arrived vessel[s] to determine whether goods requiring entry are aboard," *United States v. Ingham*, 502 F.2d at 1291.

■ Other justifications include "the universal understanding that persons, parcels and vehicles crossing the border may be searched," *United States v. Weil, supra* at 1323, and the "recognition of the difficulty involved in effectively policing our national boundaries." *United States v. Hill*, 430 F.2d 129, 131 (5th Cir. 1970).[7]

Realization of customs officials' special problems has resulted in courts giving the broadest interpretation compatible with our constitutional principles in construing the statutory powers of customs officials. *See United States v. Glaziou*, 402 F.2d 8 (2nd Cir. 1968), *cert. denied* 393 U.S. 1121, 89 S.Ct. 999, 22 L.Ed.2d 126 (1969).

Regulation of importation is not the only duty that Congress has given customs officials, however. The Comprehensive Drug Abuse Prevention and Control Act of 1970 makes illegal the exportation of marijuana and other drugs under certain circumstances. 21 U.S.C. § 955 provides that it is "unlawful for any person to bring or possess on board any vessel . . . *arriving in or departing from the United States or the customs territory of the United States*, a controlled substance . . ." (emphasis added).

■ The purpose of the act was to deal in a comprehensive fashion with the growing menace of drug abuse in the United States by providing authority for increased efforts in drug abuse prevention and more effective means for law enforcement aspects of drug abuse prevention and control. *See*

---

6. Thus it appears that the three mile limit can qualify as a "border" in the Fourth Amendment context. It is sufficient that customs officers be reasonably certain that the border was crossed. *Tilton*, 534 F.2d at 1366. Actual observation of the border crossing is not necessary. *United States v. Ingham*, 502 F.2d 1278 (9th Cir. 1974). In this case, the O/S National was seen leaving the harbor in the morning of the 6th and was later sighted nine miles off shore, leaving no doubt that the border had been crossed.

7. Although special problems of enforcement should be given weight in determining the reasonableness of a search, *Ker v. California*, 374 U.S. 23, 33–34, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963), they would not justify unwarranted infringement of the Fourth Amendment's protections resulting from the pressure of official expedience. *See Almeida-Sanchez*, 413 U.S. at 274, 93 S.Ct. 2535.

H.R.Rep. No. 91–1444 in U.S.Code & Admin.News at p. 4567, 91st Cong., 2d Sess. (1970). Regulation of exportation was evidently deemed necessary by Congress to protect Americans against the growth of drug trafficking. See 21 U.S.C. §§ 953, 955.

■ The Fourth Amendment was designed to balance the government's interests in enforcing its laws against the individual's interests in his dignity and privacy. A person leaving the country belongs to a class whose members sometimes violate certain laws in leaving.[8] On crossing a border, he is on notice that a search may be made, and his privacy is arguably less invaded by such search.

Because these searches are administered to a morally neutral class, they lack the quality of insult felt by one singled out for a search. See Note, 77 Yale L.J. 1007 (1968).

■ Thus both incoming and outgoing border-crossing searches have several features in common: (1) the government is interested in protecting some interest of United States citizens, such as restriction of illicit international drug trade, (2) there is a likelihood of smuggling attempts at the border, (3) there is difficulty in detecting drug smuggling, (4) the individual is on notice that his privacy may be invaded when he crosses the border, and (5) he will be searched only because of his membership in a morally neutral class.

Although this may be an extension of present law, the similarity of purpose, rationale, and effect between the two types of border searches compels us to hold that the search here was proper. Although it did not take place precisely at the three-mile limit, the Supreme Court has noted that border searches may take place not only at the border itself, but at its functional equivalent as well. Almeida-Sanchez, 413 U.S. at 273, 93 S.Ct. 2535.

■ This court has recently held that a bay adjacent to an ocean is a functional equivalent of a border for vessels which have travelled in foreign waters before entry. United States v. Solmes, supra. For obvious reasons, "it is not practical to set up checkpoints at the outer perimeters of the territorial waters." United States v. Tilton, 534 F.2d at 1365.

■ For the same reasons we feel that a search in customs waters is a functional border search when the vessel has crossed from territorial waters of the United States and there is sufficient evidence to convince a fact finder, to a reasonable certainty, that any contraband which might be found at the time of the search was also aboard at the border crossing. Alexander v. United States, 362 F.2d 379, 382 (9th Cir.), cert. denied 385 U.S. 977, 87 S.Ct. 519, 17 L.Ed.2d 489 (1966).

The order granting the motion to suppress is reversed, as is the judgment of non-forfeiture, and the case is remanded for further proceedings.

KILKENNY, Circuit Judge (Specially Concurring):

I fully concur with Judge Wright's analysis of the facts and his application of the border search law to those facts.

I have a firm belief that the record is also sufficient to compel a finding of probable cause for the search, but in the light of our conclusion on the validity of the border search find no sound reason for passing on the issue of probable cause.

---

**8.** Drug export laws are not the only laws involved. In *United States v. Gonzalez-Rodriguez*, 513 F.2d 928 (9th Cir. 1975), for example, appellant was convicted of exportation of arms and ammunition without obtaining the required export license.