**UNITED STATES of America**

**v.**

**Gustavo DIAZ–SEGOVIA, Francisco Diaz, William P. Trolinger, III, a/k/a Patrick W. Connors, a/k/a Concho, Michael S. Breiding, a/k/a Michael Brandon, a/k/a Pat Connors, William Troy, a/k/a William R. Gregg, Robert Palm, Paul Friedman, Fred Fillingham, Alfonso J. Joseph, John Connelly, John B. Lanham, III, April L. Jacobs, Larry G. Van Dyke and Virginia Lanham.**

Crim. A. No. N–78–0307.

United States District Court,

D. Maryland.

Aug. 29, 1978.

---

Russell T. Baker, Jr., U. S. Atty., D. Md., and Catherine C. Blake, Kurt L. Schmoke, Asst. U. S. Attys., Baltimore, Md., for the Government.

J. Flowers Mark, Alexandria, Va., and John P. Coale, Washington, D. C., for defendant Trolinger.

Paul G. Evans, Baltimore, Md., for defendant Breiding.

Myron L. Wolfson, Towson, Md., and James M. Lowe, Alexandria, Va., for defendant Troy.

Bruce Armstrong, Washington, D. C., for defendant Joseph.

Thomas J. Morgan, Miami, Fla., for defendant Connelly.

John Kenneth Zwerling, Alexandria, Va., for defendant John Lanham.

Marvin Miller, Alexandria, Va., for defendant Jacobs.

Frank A. Mika, Washington, D. C., for defendant Van Dyke.

NORTHROP, Chief Judge.

The United States has charged various of these defendants with conspiracy to violate several laws outlawing the trafficking in marijuana. On August 14 and 15, 1978, this Court held evidentiary hearings on defense motions to suppress evidence seized by government agents. The relevant facts relating to these seizures are summarized below.

## I. Facts

In May 1978, Agent Boyce Blume of the Drug Enforcement Administration (DEA) received information from the Ocean City, Maryland police force that several individuals had been arrested in Ocean City for possession of marijuana. These individuals were identified as Michael Breiding, Maureen Breiding and Mindy Lou Breiding. Agent Blume was familiar with Michael Breiding since he had allegedly been involved in suspected smuggling activities at or near Solomon's Island, New Jersey in June 1977.

On May 15, 1978, Agent Blume was shown passports, address books, and other personal effects which had been seized by the Ocean City police pursuant to the Breidings' arrests. One of these papers contained directions leading to Route 4, Box 487, Easton, Maryland. Another paper contained the name of Gustavo Segovia. Segovia was known to Agent Blume as a suspected wholesale supplier of drugs, based in Santa Marta, Columbia, South America. Subsequent investigation revealed that the Easton property was leased in the name of William P. Trolinger III. Agent Blume stated that he was aware of Trolinger's criminal record, which included a conviction for possession of 100 pounds of marijuana.

On May 19, 1978, aerial photographs were taken of the Easton property. Agent Blume then contacted the Maryland Marine

Police and the United States Customs Service and requested assistance in keeping the property under surveillance. On June 1, 1978, Agent Blume had a meeting with Customs patrol officers and advised them that he suspected that the Easton property was involved in illegal smuggling activities.

Although several photographs were taken on June 5, 1978, actual surveillance of the property by Customs patrol officers did not begin until June 9, 1978. On that day, CPO Rahr and a member of the Maryland Marine Police proceeded into the woods abutting the Trolinger property and observed the property. The next day, joined by CPO Robert Porter, the officers again took up surveillance with the use of binoculars.[1] The officers left at approximately midnight.

The next morning, June 11, 1978, the officers returned to the woods. They then copied down the license numbers of several vehicles on the property. Surveillance continued until late that night.

In the meantime, CPO Charles Albertson accompanied by CPO Fry had been maintaining surveillance on a high speed racing boat which had been initially observed in the boathouse of the Trolinger residence on June 5, 1978. Surveillance began on the evening of June 9, 1978, at Ocean City, Maryland. The boat had previously been seen that day enroute from Easton to Ocean City. The vessel was transported over land in a trailer.

Officer Larkin was dispatched to begin surveillance on the vessel, identified as a Corsa racer with Virginia registration 9917 CC. Officer Larkin reported that the boat left Ocean City and headed out into the ocean at approximately 7:25 p. m. It was followed by a similar boat with Maryland registration approximately 20 minutes later. The surveilling officers maintained visual contact for about five miles. The Maryland Corsa returned at approximately 3:30 a. m. on June 10, 1978. The Virginia Corsa returned at approximately 4:15 a. m.

---

1. Officer Porter testified that he had been informed that permission to travel on the adjoining property had been obtained.

Surveillance was continued on the two vessels and they were observed to again depart, 20 minutes apart, the evening of the 10th. Both boats returned in the early morning hours of June 11, 1978. On June 11, 1978 the boats again left in the early evening, separated by some 20 minutes, and returned in the early morning hours of June 12, 1978.

On June 12, 1978, at approximately 10:30 a. m., the Virginia Corsa was put back on the trailer, and the boat, trailer, and car towing them departed Ocean City. At that time Customs officers had received an anonymous tip that several high speed boats may have been tying contraband beside buoys located off Crisfield, Maryland. The officers decided to follow the Virginia Corsa and see if it was heading for Crisfield. This decision was reached after discussions of searching the boat in Ocean City had taken place.

The Corsa was followed for approximately 30 miles until it became apparent that it was not heading for Crisfield. The officers then stopped at the Salisbury Police Department and requested assistance in stopping the Corsa. The car, trailer, and vessel were subsequently pulled over by a Maryland State trooper.

The Corsa was then searched, and Officer Fry swept 1.2 grams of marijuana residue from the bulkheads and cracks in the boat's hull. The boat, trailer, and car were then seized and transported to the State Police Barracks.

The above information was relayed to Officer Porter via radio while he maintained surveillance at the Easton property. Officer Porter and two other Customs patrol officers had begun surveillance that day (June 12) at approximately 4:30 p. m. They observed several automobiles and individuals enter and exit the property.

Around 8:30 that night, after it had grown dark, the officers crossed a fence and entered the Trolinger property. They remained inside the wooded area, roughly 150 feet from the Trolinger house. Approximately 10 minutes later a Pontiac drove onto the property, and a white male and a white female entered the house.

The Trolinger residence consisted of a house, an attached garage, and a separate boathouse. From the officers' vantage point, the garage was nearest to them, blocking their view of the house. The driveway to the garage ran perpendicular to the officers' line of sight, with the front of the residence facing left. Located on the far side of the driveway, 20 feet from the intersection between the garage and house was an electric light affixed to a metal pole.

The officers noticed that at approximately 10:00 p. m. the electric light was flashed on and off several times. A vehicle was immediately seen to enter the driveway and park facing the garage. Two individuals exited from the vehicle, which was a dark-colored van, and entered the house. About 10 minutes later, an individual came out of the house, entered the van, and returned to the house carrying a package.

Ten minutes later the Pontiac left with two individuals, and another individual walked from the house toward the boathouse. The officers heard noises coming from the boathouse and a vehicle was driven from the vicinity of the boathouse, up the driveway, and parked end to end with the van in front of the garage. At that time a second individual had come out of the house and was standing behind the van. The driver of the second vehicle, which was a pickup truck with a camper, opened the back of the truck and threw several items out of the back, including a spare tire. Simultaneously, the individual who had opened the van began to remove packages from the back of the van and hand them to the individual inside the truck.

The packages were approximately two to three feet square and apparently wrapped in polyurethane. The officers then decided to move in closer. Officer Porter stated that, from what he had seen and knew, he believed that the packages contained marijuana.

The officers then crawled across the lawn to a point near the garage. Officer Porter was approximately eight to ten feet from

the vehicles, and the other officers were several yards behind him. At that point, Officer Porter detected the odor of marijuana.

The Pontiac then returned, and the occupants of the Pontiac approached the van. After a brief conversation, one of them went into the house and returned carrying a small rug. He shook out the rug very close to where the officers were hiding, and Officer Porter again detected the odor of marijuana.

The individual then rolled up the rug and began walking back towards the garage. He dropped the rug in front of Officer Porter, and thinking he had been discovered, Officer Porter whispered, "Pssst, come here." In response, the individual screamed and ran.

As might be imagined, much activity ensued at this point. The Customs officers jumped up, identified themselves as federal officers, and commanded the individuals to halt. The various individuals near the van scattered, the officers giving chase. Officer Porter made a sharp right turn across the front of the garage and saw an individual running across the front yard of the house. An individual identified as defendant Larry Van Dyke stopped near the van and had his hands up. He was immediately arrested.

Officers Porter and Christo then cautiously looked into the van and a female later identified as defendant April Jacobs was arrested. *Miranda* warnings were given to both Van Dyke and Jacobs.

Officer Rahr in the meantime had gone around the back of the house in an attempt to intercept the suspect Officer Porter had seen fleeing near the house. Officer Rahr returned shortly thereafter and was sent back to the officers' automobile to radio for backups.

Fifteen minutes later, units from the Maryland State Police arrived. Since two suspects were missing, the officers requested the state police to bring a K–9 unit. Upon arrival, the police dog and several officers did a room-to-room search for sus-

pects in the Trolinger house. In the living room, the officers noticed marijuana lying in plain view. No individuals were found inside the house.

Agent Blume was called just after midnight and informed of the arrests and seizures. He called Agents Joseph Flannery and Joseph Lodge. The three agents then proceeded to Easton. Upon arrival at approximately 1:30 a. m., the DEA agents took custody of the prisoners and assumed responsibility of the investigation. Shortly after their arrival, Agents Lodge and Blume entered the house for the purpose of inspecting the large amount of radio equipment located in one of the corner rooms. After a five minute inspection, they departed the house.

Between 3:00 and 3:30 a. m., a Cadillac entered the driveway leading up to the house. Officer Porter approached the vehicle, identified himself, and ordered the car to stop. The driver immediately placed the vehicle in reverse and accelerated backwards away from the house. At that point, a state trooper car which had pulled in behind the Cadillac blocked its exit, and the occupants of the Cadillac were arrested. The occupants were defendant William Trolinger (who was utilizing false identification), defendant Alfonso Joseph, Michael Dwan Lucker, and John Michael Smith.

All the suspects were subsequently brought to Talbot County Jail and fingerprinted and photographed. At the jail, Agent Blume discovered that Michael Breiding had been captured by the Maryland Marine Police.

Shortly after the arrest at the Easton property, Corporal R. P. Turkington of the Maryland Marine Police stationed himself offshore near the Trolinger residence in a 32 foot power boat. Corporal Turkington had been warned to be on the lookout for anyone fleeing from the Bailey's Neck area. After his radar picked up a small vessel, he hailed it and subsequently chased and captured the boat and its driver. Breiding furnished Corporal Turkington with identification naming him as Riley Gene Jones.

When Agent Blume arrived at the Talbot County Jail between 4:30 and 5:00 a. m., he recognized Breiding from a photograph he had received from the Ocean City police. Blume had also been informed by Officer Porter that Breiding had been seen in the Pontiac that night and had been present but not arrested at Easton.

At that point, Agent Lodge interviewed the prisoners and offered each a chance to cooperate. Michael Breiding indicated that he was willing to cooperate if he was given something in return. Agent Lodge phoned an Assistant United States Attorney in Baltimore and a rudimentary plea agreement was worked out.

Breiding then asked Agent Lodge how much marijuana had been seized at Easton. Upon receiving a response that one ton had been seized, Breiding informed Agent Lodge that he knew where there was another nine tons and five defendants. Breiding stated that, although he had never been to the area, there was a house on the Eastern Shore near Chincoteague where the contraband was located. Breiding described the residence as being in a heavily wooded area and belonging to a person by the name of Shelly or Shelby. The house was located a couple of miles north of the main access road into Chincoteague. Breiding further described the property as being bordered by water on the west side, with the house facing the street. Breiding indicated that the agents would find a red pickup truck on the property in a disabled condition. Breiding then identified the approximate location of the Chincoteague residence on a map. Breiding advised Agent Lodge that the occupants of the Chincoteague residence might be warned by a woman in Washington, D. C. who was manning a "message center."

At approximately the same time, Major Cook of the Maryland Marine Police had been provided with papers which had been taken from Mr. Trolinger. He had advised Agent Blume that the papers contained directions to an area close to the Virginia-Maryland State line.

After Agent Lodge concluded his interview with Breiding, he was informed that a press release had been issued by the Maryland State Police. At that point, a reporter from WCAO radio station telephoned and asked for information. Agent Lodge requested her not to report the arrest anymore. Agent Lodge did inform a local reporter that the investigation was continuing, after he was assured that this information could not be published until later in the day.

DEA Agents Lodge, Flannery, and Santos along with several Customs officers and Marine Police were delegated to drive to Chincoteague. Once the agents arrived in Virginia, Agent Lodge stopped at a telephone and called his office in Baltimore, Maryland. He testified that he was concerned that, since he had heard radio broadcasts of the Easton arrest on his way to Virginia, the suspects may have been tipped off.

Shortly thereafter, Agent Lodge observed a Virginia police officer in a radar car and advised him of the situation. The Virginia trooper radioed for a backup unit and two units responded. The trooper indicated that he was familiar with the property that was described to him which belonged to Dr. Shelly.

Agent Lodge testified that upon arrival at the Shelly residence he noticed a red pickup located where Mr. Breiding had said it would be. The physical description of the property was identical to Breiding's. Agent Lodge determined to enter the property.

Agent Lodge drove up the driveway until he reached a locked gate. Agent Lodge broke through the gate with his car and proceeded about 400 feet up to the house. Agent Lodge testified that he then went up to the front door, knocked, and announced his presence as a federal officer. He further stated that he heard some scuffling noises inside, so he turned the handle and entered the house with his gun drawn. He was met there by defendants William Troy (then identified as William Gregg) and John Lanham. After arresting the two de-

268

fendants, Agent Lodge made a quick search for confederates and discovered approximately four tons of marijuana in plain view. The defendants were subsequently transferred to Baltimore and brought before a United States Magistrate.

## II. *Law*

As should be obvious by a cursory glance at the above facts, several distinct issues are presented. The Court will address the various arrests, sweeps, and searches *seriatim*.

### A. *The Easton Arrests—Jacobs and Van Dyke*

Of primary importance is the initial arrest of defendants Jacobs and Van Dyke, since if this arrest is determined to be invalid, it would appear that the entire remainder of the investigation of June 12 and 13, 1978 would be the "fruit of the poisonous tree" and hence inadmissible. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

Since this Court is governed by controlling precedent from the United States Court of Appeals for the Fourth Circuit, relevant cases from that body will now be examined. The Court looks to cases which provide analogous situations to the facts here—officers keeping the Trolinger property under surveillance, and with certain information, observe the passing of packages from their vantage point 15 yards inside a fence and 150 feet from the dwelling. The officers then proceed to a point adjacent to the house and effect an arrest.

In *Patler v. Slayton*, 503 F.2d 472 (4th Cir. 1974), spent casings and shells were found in the pasture of a farm 250 feet from a house pursuant to a defective warrant. The Fourth Circuit upheld the dismissal of a habeas corpus action despite the invalid search warrant since a reasonable expectation of privacy attaches to dwellings and the immediate area around them, and not to open fields.

*United States v. Bradshaw*, 490 F.2d 1097 (4th Cir. 1974), *cert. denied*, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974) involved

federal agents investigating suspected moonshining activities. The agents discovered an abandoned truck containing moonshine near defendant's driveway. They entered defendant's property to ask him about it. After receiving no answer in response to their knock on the front door, the agents proceeded to the back door and noticed a pickup truck with sides on it, which smelled of moonshine. One of the agents put his eye to a crack in the wood and observed gallons of moonshine inside. The Fourth Circuit held that the agent's observation did not constitute "plain view" and hence was inadmissible. In order for plain view to be applicable, (1) the officer must have a right to be in the position he occupies, and (2) the discovery must be inadvertent. Here, the agent did have a right to be where he was, but the discovery was not inadvertent. Accordingly, the agents should have guarded the truck, gone and obtained a search warrant based on the smell, and then made the search.

In *United States v. Brown*, 487 F.2d 208 (4th Cir. 1973) (per curiam), *cert. denied*, 416 U.S. 909, 94 S.Ct. 1617, 40 L.Ed.2d 114 (1974) the Court sanctioned Alcohol, Tobacco, and Firearms (ATF) agents unauthorized entry onto defendant's land which provided probable cause to obtain a search warrant. The agents had walked up to a barn on defendant's property and smelled moonshine. Without entering the barn, they left the property and obtained a search warrant. The Fourth Circuit held that despite the fact that the barn was part of the curtilage, no reasonable expectation of privacy attached to open fields around a barn.

ATF agents observed defendant make a moonshine transaction in his backyard from their position in an adjacent cornfield in *United States v. Campbell*, 395 F.2d 848 (4th Cir.) (per curiam), *cert. denied*, 393 U.S. 834, 89 S.Ct. 106, 21 L.Ed.2d 105 (1968). The Court held that the agents were not within the curtilage and hence the observation fell within the "open fields" exception. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) was held to require no different result.

In *United States v. Shue*, 385 F.2d 416 (4th Cir. 1967) (per curiam), *cert. denied*, 389 U.S. 1045, 88 S.Ct. 790, 19 L.Ed.2d 837 (1968) agents observed suspicious activity and smelled illegal whiskey. As an agent approached defendant's home, he observed defendant loading whiskey. The Court held that there was no unlawful entry on the curtilage of the property since earlier observations gave the agents "ample cause to believe a felony was being committed."

*United States v. Mullin*, 329 F.2d 295 (4th Cir. 1964) involved agents who had stationed themselves in weeds near a smokehouse on the defendant's property, 75 feet from a dwelling. A pickup arrived and four men began to unload cartons and carry them to the smokehouse. After the men were in the smokehouse, the agents smelled the aroma of illicit whiskey. The agents thereupon opened the door of the smokehouse and arrested the occupants. The Fourth Circuit suppressed the evidence produced by the arrest since the search incident to the arrest began with the officer's unauthorized entry. The Court rejected the government's argument that the smokehouse was not within the curtilage of the property.

Finally, in *United States v. Young*, 322 F.2d 443 (4th Cir. 1963), *cert. denied*, 375 U.S. 952, 84 S.Ct. 443, 11 L.Ed.2d 313 (1963) agents had stationed themselves in woods outside the property. They smelled illegal moonshine and then approached defendant's barn. The door was thereupon opened from the inside by defendant, who was unaware of the agent's presence outside. The agents viewed the contents of the barn, arrested defendants, and seized the moonshine. The Court upheld the seizure since the entry for purpose of arrest was lawful. The viewing of the moonshine fit within the plain view exception.

The two Supreme Court opinions which affect the above decisions are *Katz v. United States, supra* and *Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924). *Katz* held basically that the fourth amendment protects people rather than places, and that a person might be protected from searches where he had a reasonable expectation of privacy. *Hester*, a rather laconic decision by Justice Holmes, held that the fourth amendment does not extend its protections to observations or seizures made while a defendant is in "open fields."

Recent decisions by other circuit courts of appeals appear to be in conformance with the Fourth Circuit. *See United States v. Basile*, 569 F.2d 1053 (9th Cir. 1978) (fourth amendment does not extend to open fields since no reasonable expectation of privacy; agent's observation of marijuana transaction 100 yards behind defendant's house upheld); *United States v. Johnson*, 182 U.S. App.D.C. 383, 561 F.2d 832 (1977) (en banc) (officer who took step off sidewalk and peered in unshuttered window committed only "technical trespass" and hence plain view doctrine applies). *United States v. Bensinger*, 546 F.2d 1292 (7th Cir. 1976), *cert. denied*, 431 U.S. 930, 97 S.Ct. 2633, 53 L.Ed.2d 245 (1977) (warrantless search of "goosehouse" upheld since over 400 feet from dwelling; cases construing curtilage surveyed, with conclusion that curtilage limited to 75 feet from house); *United States v. Carriger*, 541 F.2d 545 (6th Cir. 1976) (*Katz* and the case law before it, when considered together, should be read as holding that trespassing is one form of intrusion by the government that may violate a person's reasonable expectation of privacy); *United States v. Holmes*, 521 F.2d 859, *aff'd en banc*, 537 F.2d 227 (5th Cir. 1976) (agents surround property containing suspected drug activity; agent crawls through bushes and peers into shed through hole in the wood; later warrant held not to vitiate warrantless search of shed; plain view doctrine held inapplicable).

These cases seem to indicate that despite the admonition in *Katz* that the fourth amendment protects people not places, property concepts have not been entirely ruled out of consideration by the courts in determining the legality of governmental intrusion into individual's property.

In the early part of the century, the Supreme Court was primarily concerned

with determining whether the curtilage had been trespassed upon by agents. Thus, in *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928) the Court held that the warrantless interception of a telephone conversation was not a violation of the fourth amendment in the absence of a physical trespass. Accordingly, *Hester v. United States, supra*, merely applied the rule that searches in an open field involved no trespass within a house or its curtilage and therefore did not constitute a violation.

In 1967, when *Katz* overruled *Olmstead*, the focus shifted to whether or not an individual had a reasonable expectation of privacy. Recently, the High Court has held that this test can *restrict* an individual's right to challenge a warrantless arrest and search. See *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). In *Santana*, the Court held that the warrantless arrest and search of a woman, who had been spotted in her doorway and then retreated inside, was justified since she was in a "public place" for the purposes of the fourth amendment. Of particular interest is Justice Rehnquist's citation to *Hester* in support of this decision. Thus, the Supreme Court seems to have included some property concepts in its analysis of whether a person has an expectation of privacy. Consequently, this Court is of the opinion that the Fourth Circuit cases cited above continue to be valid, binding precedent.

■ The rule of law that the Court draws from the above cases is that agents are allowed to trespass upon individual's property as long as they do not search the house or curtilage and do not physically enter or peer into enclosed buildings, vehicles, or the like. An agent may observe activity from a vantage point which may be upon a defendant's property, if such observation is made across "open fields" from an area sufficiently removed from the dwelling to prevent unauthorized surveillance inside the house. If the agent, through his observations, develops probable cause to believe that a crime is being committed, he may further enter the property in order to effect an arrest. However, he must obtain a search warrant in order to enter and search any building, vehicle, etc. which hides items sheltered from public view.

■ The facts here indicate that Officer Porter was physically inside defendant Trolinger's property at the time he observed the loading of the packages, although he was still in the woods and approximately 150 feet from the house. This Court finds that Officer Porter was not trespassing upon the curtilage at this point, since he was physically removed from the house by a sufficient distance.

■ The question thus becomes whether Officer Porter had probable cause to believe that a crime was being committed when he and his fellow officers moved into the property, after they observed the loading of the packages begin. Since a determination of probable cause depends upon the totality of an officer's knowledge at the time he decides to arrest, *United States v. Woods*, 544 F.2d 242 (6th Cir. 1976), *cert. denied*, 429 U.S. 1062, 97 S.Ct. 787, 50 L.Ed.2d 778 (1977), it is necessary to examine the factors that Officer Porter was aware of at approximately 10:15 p. m. on June 12, 1978. He was aware: (1) that individuals in possession of two pounds of marijuana had been arrested in Ocean City with directions to this property; (2) that the property was leased in the name of Trolinger, a known drug trafficker; (3) that the boathouse of the Trolinger residence had been occupied for some time by a high-speed ocean racer of the type commonly used by smugglers; (4) that the boat had been observed under suspicious circumstances in Ocean City; (5) that the boat had been seized by Customs officers earlier that day and marijuana residue found in it; (6) that over the past several days, various out-of-state cars had been seen entering and leaving the property; (7) that the van had entered the property only after receiving the apparent signal from the occupants of the house, via the flashing of the pole light; (8) that the individuals near the van and pickup were loading 2–3 foot square packages, wrapped in polyurethane; and (9) that he had observed packages similar to these to contain marijuana.

■ This Court is of the opinion that Officer Porter clearly had probable cause to suspect that a crime was being committed in his presence. Accordingly, he was authorized to enter the property in order to effect an arrest. *United States v. Campbell, supra;* 26 U.S.C. § 7607 (1970).

■ Once Officer Porter had made the arrests of defendants Jacobs and Van Dyke, he observed approximately one ton of marijuana in plain view. It is clear that the seizure of this marijuana was proper. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

### B. *The Trolinger Residence*

Shortly after the arrests, the officers did a "protective sweep" of the house in conjunction with a K–9 unit from the Maryland State Police. The government has offered two theories justifying this warrantless entry: the "hot pursuit" doctrine, *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) or the "protective sweep" exception. *United States v. Baker,* 577 F.2d 1147 (4th Cir. 1978).

In *Warden v. Hayden,* the Supreme Court upheld the warrantless entry of a house by police, in pursuit of an armed robber who had fled from the scene of the robbery and had been observed entering the house. The police arrival minutes later was sanctioned by the court since:

> The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential, and only a thorough search of the house for persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape. 387 U.S. at 298–99, 87 S.Ct. 1646.

Accordingly, an exception to the warrant requirement was carved out for situations in which a pursuing officer followed a felon into a house. *See United States v. Oaxaca,* 569 F.2d 518 (9th Cir. 1978). It is to be distinguished from a case like *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 20, 34, 23 L.Ed.2d 685 (1969) in which police officers searched an entire house "incident to the arrest" of a burglary suspect pursuant to an arrest warrant. The Court held that a search was unreasonable where it extended beyond the defendant's person or the area from which he might have obtained a weapon.

The lower courts have applied the *Hayden* case to other situations where an officer is in danger. In *United States v. Baker, supra,* the Fourth Circuit upheld a warrantless "sweep" of a house for confederates, after two suspects were arrested in front of the house. The court noted that the police knew that defendant had been armed and that he had confederates. Finding that this fear was reasonable, the court allowed evidence which had been in plain view, and seized during the sweep, to be admitted. *See United States v. Sellers,* 520 F.2d 1281 (4th Cir. 1975), *modified on other grounds,* 547 F.2d 785 (1976), *cert. denied,* 429 U.S. 1075, 97 S.Ct. 815, 50 L.Ed.2d 793 (1977).

Other circuits have divided on this question. *See United States v. Bowdach,* 561 F.2d 1160 (5th Cir. 1977) (officers have right to conduct a quick and cursory check of a residence when they have reasonable grounds to believe that there are persons present who might present a security risk); *United States v. Hobson,* 519 F.2d 765 (9th Cir.), *cert. denied,* 423 U.S. 931, 96 S.Ct. 283, 46 L.Ed.2d 261 (1975) (warrantless search of house upheld where officers had seen defendant just prior to entry; officers aware defendant had participated in a killing to effect an escape). *But see United States v. Carter,* 173 U.S.App.D.C. 5, 522 F.2d 666 (1975) (fact that defendant was charged with firearms offense and known to have confederates did not justify search of upstairs rooms of house). *United States v. Cooks,* 493 F.2d 668 (7th Cir. 1974) (warrantless search not justified despite arrest of defendants with empty shoulder holsters and marijuana in plain view).

■ The question seems to boil down to whether (1) the police have a reasonable

belief that a suspect is present in the house; and (2) whether the police reasonably fear that the suspect is armed and dangerous. Here the facts indicate that no suspect was ever seen running into the house. Officer Porter testified that he saw:

an individual running away from me across the front of the house which would have been the driveway side of the house.

Q. Which direction was the individual running?

A. He would have been running to what would have been the west, generally towards the boathouse, in that general direction. (Transcript of Suppression Hearing, August 14, 1978, at 139).

It is apparent that there was no indication, other than the fact that two suspects had escaped, that anyone was in the house.

Moreover, it seems that the officers waited an appreciable period of time prior to entering the house. Officer Porter testified that it was approximately 30–40 minutes after the initial arrest that the house was entered. The cases cited above all deal with situations where an immediate entry was made by police in response to exigent circumstances. Here the fact that officers waited outside of the house for a half-hour or more, apparently in view and in range of any armed felon, militates against a finding that the entry of the house was in fact an emergency.[2] The Court is certainly not unmindful of the dangers faced by federal agents in performing this hazardous job, but to allow a protective sweep in the circumstances presented here could result in a situation where the exception swallows the rule. No evidence was introduced that any agents had any suspicions that defendants were either armed or dangerous. The absence of these factors, particularly when combined with the delay in entering the house, necessitate the Court's finding that the officer's search of the house does not fall within one of the exceptions listed above. Consequently, the officers' warrantless entry was a violation of the fourth

amendment and the fruits of such entry will be suppressed. That a later search warrant was obtained is of no moment since it was based upon an illegal search.

## C. The Easton Arrests—Trolinger and Joseph

Defendant Trolinger has argued strenuously that evidence discovered as a result of his arrest should be suppressed. Trolinger asserts that he was arrested without probable cause since he was not present at the time of the original arrest and was only detained because he had attempted to leave the premises.

The facts relating to this aspect of the case are as follows. Sometime after 3:00 a.m., on June 13, 1978, a Cadillac entered the driveway of the Easton residence. After being commanded to halt by a federal officer, the car accelerated backwards until it was blocked off by a police vehicle. The occupants were subsequently arrested, and pursuant to their arrest and later booking, various papers were seized.

■ Trolinger argues that flight alone is insufficient to establish probable cause, citing *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). This proposition is undeniably true, and if the Cadillac's flight were the only evidence known to the federal officers, Trolinger's motion to suppress would have to be granted. However, as stated before, probable cause is based upon the total knowledge of the arresting officers. Here, the officers were confronted by evidence of a major smuggling conspiracy. Very late at night, in a rural area, a car proceeded onto the property and then attempted to depart. Moreover, although Trolinger provided identification which portrayed him as Patrick Connors, this name was also known to the officers and had been connected with a vehicle which had been previously identified on the property. Given all these facts, this Court is of the opinion that *Wong Sun* is distinguishable, since corroborative factors are present here which combined with the

2. *See Vance v. North Carolina*, 432 F.2d 984 (4th Cir. 1970).

flight of defendants to establish probable cause.

### D. The Chincoteague Arrests and Search

The relevant law in reference to warrantless entry upon property and the necessity for a warrant (or an exception) to enter a house has been discussed above. In order to sustain the DEA's warrantless entry into the Shelly residence, the government stresses that the exigent circumstances required the agents to take the actions they did. Defendants argue that Agent Lodge could have obtained a search warrant on the way to Chincoteague, particularly since they passed through Salisbury, Maryland, where a United States Magistrate was located.

This Court is not convinced by defendants' argument that Agent Lodge could have obtained a search warrant prior to his arrival at Chincoteague. It is a close question whether, in the absence of corroboration of the informant's tip, and the inaccurate address of the residence, a magistrate would have been authorized to issue a warrant.[3]

■■■ Once Agent Lodge arrived at Chincoteague and viewed the property, however, it is clear that the corroboration of the informant's tip was complete, and a warrant could have been obtained. Consequently, the correct procedure would have been to surround and stake out the Shelly residence (which was covered by heavy undergrowth), and send one of the agents to obtain a warrant. It appears that it would not have been difficult to obtain a search warrant by dispatching a DEA agent along with a Virginia State trooper, since a Virginia court was located only minutes away. Moreover, once the house was surrounded no exigencies required a warrantless entry.[4] Accordingly, the search of the Shelly residence was not sanctioned by any exception to the warrant requirement, and the fruits of that search will be suppressed. *See United States v. Rosselli*, 506 F.2d 627 (7th Cir. 1974) (Stevens, J.); *United States v. Bradshaw, supra.*

In sum, this Court has merely applied the same rule applied to the Easton search—the agents are allowed to enter the property in order to surveil it, but entry into a building, especially a dwelling, requires a warrant.

### E. Motion to Suppress Evidence Taken From The Virginia Corsa

In support of his motion to suppress the marijuana residue seized from and other fruits of the search of the Virginia Corsa, defendant Connelly argues that the stop and search of his vehicles lacked probable cause and does not fall within the border search exception to the fourth amendment. In opposition to this motion, the government has attempted to justify the search as a valid customs search or, in the alternative, a vehicle search based upon probable cause. Since the Court concludes that the search was valid as an extended border search, it need not reach the issue of probable cause.

■■■ Unlike their domestic counterparts, border searches need not satisfy the probable cause requirement of the fourth amendment. *United States v. Ramsey*, 431 U.S. 606, 619, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977). By statutory authorization from the same first Congress that proposed the fourth amendment,[5] Customs agents are permitted to stop any vessel that crosses the international borders of this country. *Ramsey, supra*, at 617–19, 97 S.Ct. 1972. This exception to the amendment's restrictions is based on the sovereign's need to protect itself from the unlawful entry of

3. Moreover, it is apparent that United States Magistrate Bailey, stationed in Salisbury, Maryland would not have had jurisdiction to issue a warrant. His jurisdiction in Virginia only extends to the federal reservation off Chincoteague Island.

4. It is patently obvious that any attempt to destroy the approximately nine tons of marijuana that the agents believed to be present in the house would have to be, at best, only partially successful. *Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) is therefore inapposite.

5. *See* Act of July 31, 1789, c. 5, 1 Stat. 29, 43, § 24; *United States v. Ramsey*, 431 U.S. 606, 616, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977).

dangerous persons or articles into this country and derives its reasonableness from the neutral character of its selection principle—the crossing of an international border. *See Ramsey, supra,* at 619, 97 S.Ct. 1972; *United States v. Brignoni-Ponce,* 422 U.S. 873, 878–79, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *United States v. Stanley,* 545 F.2d 661, 666–67 (9th Cir. 1976). As a search moves away from the border, however, its implicit reasonableness diminishes and fourth amendment considerations become more important. Thus searches at fixed checkpoints and roving border patrols require probable cause to be valid. *United States v. Ortiz,* 422 U.S. 891, 896–97, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975); *Brignoni-Ponce, supra* 422 U.S. at 884, 95 S.Ct. 2574; *United States v. Russell,* 546 F.2d 839, 840 (9th Cir. 1976).

In *Almeida-Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), the Supreme Court observed that customs or border searches may be conducted at the functional equivalents of the border. *Id.* at 272–73, 93 S.Ct. 2535. For example, searches on roads near the border and at airports with significant international traffic are permissible extensions of the border concept. Lower court cases have established an additional situation in which searches may be extended beyond the spatial proximity of the border. *See United States v. Stanley, supra; Alexander v. United States,* 362 F.2d 379 (9th Cir.), *cert. denied,* 385 U.S. 977, 87 S.Ct. 519, 17 L.Ed.2d 439 (1966). This exception, termed the extended border search, looks to the totality of the circumstances present in each case to determine whether the principle underlying the per se reasonableness of border searches has become too attenuated and fourth amendment considerations have been activated. In making this determination, the court must find with reasonable certainty that any contraband "which might be found in or on the vehicle at the time of search was aboard the vehicle at the time of entry into the jurisdiction of the United States." *Alexander, supra,* at 382. The court must weigh the time and distance from the crossing, the basis of the agents'

suspicion, and the extent of surveillance conducted after the contraband crosses the border. *Id.; United States v. Flores,* 531 F.2d 222 (5th Cir.), *cert. denied,* 429 U.S. 976, 97 S.Ct. 484, 50 L.Ed.2d 584 (1976). If the contraband is small in size and easily moveable, the court should scrutinize interruptions in surveillance more closely. *United States v. Anderson,* 509 F.2d 724, 726 (9th Cir.), *cert. denied,* 420 U.S. 910, 95 S.Ct. 831, 42 L.Ed.2d 840 (1976). However, it is not necessary that there be no break in surveillance so that it is absolutely certain that the contraband crossed the border. *United States v. Weil,* 432 F.2d 1320, 1322 (9th Cir.), *cert. denied,* 401 U.S. 947, 91 S.Ct. 933, 28 L.Ed.2d 230 (1971).

The present search falls within the extended border search concept. The record shows that the Virginia Corsa went out to sea several times between June 9th and 11th. Customs agents observed the boat pass the horizon and estimated the distance as five miles. Customs officials need not determine with absolute certainty that a vessel has crossed the three mile limit that marks the international maritime border. *United States v. Tilton,* 534 F.2d 1363, 1366 (9th Cir. 1976); *United States v. Ingham,* 502 F.2d 1287 (5th Cir. 1974), *cert. denied,* 421 U.S. 911, 95 S.Ct. 1566, 43 L.Ed.2d 777 (1975).

Once the agents had ascertained a border crossing with reasonable certainty, they possessed the power to conduct a full search. *Stanley, supra,* at 666. Their decision to delay the search must be judged by the knowledge they possessed at the time they left Ocean City, the purpose of the delay, the distance and time they waited before searching, and the level of surveillance they maintained. At the time the agents left Ocean City, their knowledge supported a reasonable belief that contraband, either in bulk or residue, might be on board and increased the likelihood that the contraband would remain there until they conducted the search. The activities of the boat were extremely suspicious. The boat, a type known for its use in drug smuggling

operations, had left a residence in Easton, Maryland suspected as a base for large scale drug trafficking. At Ocean City, it set out to sea at odd hours and at a twenty minute interval from another "cigarette" boat connected to the Trolinger residence.[6] It repeated this pattern on three consecutive nights. More important, Customs agents also received information that racing boats, similar in type to the Virginia Corsa, had been sighted tying possible contraband to buoys off Crisfield, Maryland. Realizing a possible connection between this information and the Virginia Corsa's activities, the agents decided to delay the customs search until they could determine whether the Connelly vehicle would rendezvous with confederates in Crisfield. When this purpose and the total knowledge of the agents are considered, the decision to delay the search does not attenuate the per se reasonableness of their power to search the vessel in Ocean City. *See Stanley, supra* at 667.

The distance and time between the border crossing and search—30–33 miles and not more than 1–1½ hours—also support the reasonableness of the search. Both were carefully circumscribed by the agents' purpose. As soon as the Connelly vehicle passed the Route 13 turnoff to Crisfield, the agents undertook actions to stop and search the vehicle. In addition, the level of surveillance provides almost absolute certainty that contraband seized during the search was aboard the vessel at the border crossing. *See Stanley, supra* at 667; *Alexander, supra* at 382. The agents interrupted surveillance only once, in Salisbury, Maryland, when they sought assistance in making a stop of the vehicle. Moreover, the type of contraband seized, marijuana residue, is not easily moveable and it is highly unlikely that it attached itself to the bulkheads of the vessel after the border crossing.

6. This vessel, a Corsa racer with Maryland registration, had been linked with a BMW that agents had observed on the Trolinger property.

7. This ruling does not encompass any motions to suppress connected with the government's

For all of the above reasons, this Court finds that the search of the Virginia Corsa was a valid extended border search. The crossing of the border, the suspicious activity, the purpose of the delay, and the almost continuous surveillance of the vessel lead this Court to believe that this search was carefully limited by the principle underlying the border search exception and does not implicate true Fourth Amendment considerations.

### III. *Conclusion*

For the reasons stated above, this Court will grant defendants' motions to suppress as to (1) any evidence deriving from the protective sweep of the Trolinger residence and (2) any evidence deriving from the search of the Shelly residence. All other motions to suppress are denied.[7]

destruction of evidence. The Court's rulings on the various appeals from U.S. Magistrate Smalkin's recommended disposition of outstanding pretrial motions will be contained in a separate opinion shortly to be filed.