**UNITED STATES v. CHABOT.**

**UNITED STATES v. FLIEGEL.**

Nos. 90–91, Dockets 22152–22153.

United States Court of Appeals Second Circuit.

Argued Nov. 9, 1951.

Decided Dec. 19, 1951.

Myles J. Lane, New York City (Stanley D. Robinson and Robert Martin, New York City, of counsel), for appellee in the Southern District of New York.

M. J. Fein, New York City (Henry G. Singer, Brooklyn, N. Y., of counsel; Harry Silver, Brooklyn, N. Y., on the brief), for appellant, Chabot.

Frank J. Parker, Brooklyn, N. Y. (George W. Percy, Jr., Maurice Z. Bungard and Mariano Marrocco, Brooklyn, N. Y., of counsel), for appellee in the Eastern District of New York.

Henry G. Singer, Brooklyn, N. Y. (Harry Silver, Brooklyn, N. Y., on the brief), for appellant, Fliegel.

Before SWAN, Chief Judge, FRANK, Circuit Judge, and COXE, District Judge.

FRANK, Circuit Judge.

Chabot and Fliegel were each indicted for wilfully possessing gold bullion without licenses in violation of Executive Order 6260, as amended, 12 U.S.C.A. § 95a note, and 12 U.S.C.A. § 95a.[1] Fliegel pleaded guilty, but Chabot stood trial. The government showed that customs agents had found 4300 ounces of gold bullion hidden in the body of Chabot's car which he was attempting to ship abroad. Chabot rested after the government's case, and the jury found him guilty.

1. Both appellants claim that Order 6260 and 12 U.S.C.A. § 95a, originating in 1933, were effectively repealed by the Gold Reserve Act of 1934, 31 U.S.C.A. §§ 442, 443.[2] The alleged repeal, if any,

---

[1]. Fliegel was indicted for violating Treasury Regulations issued pursuant to Order 6260, as well as the Order itself. These regulations are unreported in the Federal Register. The indictment, however, charges facts, to which Fliegel pleaded guilty, that constitute a violation of Order 6260 supporting his conviction and sentence without regard to any supplementary Treasury Regulations issued pursuant to the Order. Mention of these regulations was mere surplusage in the indictment.

[2]. Title 12, § 95a, U.S.C.A., reads in part as follows:

"95a. Embargo on bullion or coin; hoarding; requirement of disclosure; penalties; United States to include Philippine Islands.—(1) During the time of war or during any other period of national emergency declared by the Presi-

must be by implication, for in no place in the 1934 Act is there any express suggestion that the earlier measures are replaced. It is true that both the 1933 and

dent, the President may, through any agency that he may designate, or otherwise, and under such rules and regulations as he may prescribe, by means of instructions, licenses, or otherwise—

"(A) investigate, regulate, or prohibit, any transactions in foreign exchange, transfers of credit or payments between, by, through, or to any banking institution, and the importing, exporting, hoarding, melting, or earmarking of gold or silver coin or bullion, currency or securities, * * *.

"(3) * * * Whoever willfully violates any of the provisions of this section or of any license, order, rule or regulation issued thereunder, shall, upon conviction, be fined not more than $10,-000, or, if a natural person, may be imprisoned for not more than ten years, or both; * * *."

Excerpt from Executive Order No. 6260, promulgated August 28, 1933, by virtue of Title 12, § 95a, as amended March 9, 1933:

"Sec. 5. Holding of gold coin, gold bullion, and gold certificates.—After 30 days from the date of this order no person shall hold in his possession or retain any interest, legal or equitable, in any gold coin, gold bullion, or gold certificates situated in the United States and owned by any person subject to the jurisdiction of the United States, except under license therefor issued pursuant to this Executive order; provided, however, that licenses shall not be required in order to hold in possession or retain an interest in gold coin, gold bullion, or gold certificates with respect to which a return need not be filed under section 3 hereof.

\*     \*     \*     \*     \*

"Sec. 9. The Secretary of the Treasury is hereby authorized and empowered to issue such regulations as he may deem necessary to carry out the purposes of this order. * * *

"Sec. 10. Whoever willfully violates any provision of this Executive order or of any license, order, rule, or regulation issued or prescribed hereunder, shall, upon conviction, be fined not more than $10,000, or, if a natural person, may be imprisoned for not more than 10 years, or both; * * *."

The Gold Reserve Act of 1934, reads in part as follows:

"441. Gold Coin and Bullion Transferred to United States; Accounts; Custody. Upon the approval of this Act (Jan. 30, 1934) all right, title, and interest, and every claim of the Federal Re-serve Board (Board of Governors of the Federal Reserve System), of every Federal Reserve bank, and of every Federal Reserve agent, in and to any and all gold coin and gold bullion shall pass to and are hereby vested in the United States; * * *.

"442. Same: Regulations respecting Acquisition, Holding, or Transportation of Gold: Exemption of outlying Possessions. The Secretary of the Treasury shall, by regulations issued hereunder, with the approval of the President, prescribe the conditions under which gold may be acquired and held, transported, melted or treated, imported, exported, or earmarked: (a) for industrial, professional, and artistic use; (b) by the Federal Reserve banks for the purpose of settling international balances; and, (c) for such other purposes as in his judgment are not inconsistent with the purpose of this Act (§§ 441, 442 of this title). Gold in any form may be acquired, transported, melted or treated, imported, exported, or earmarked or held in custody for foreign or domestic account (except on behalf of the United States) only to the extent permitted by, and subject to the conditions prescribed in, or pursuant to, such regulations. Such regulations may exempt from the provisions of this section, in whole or in part, gold situated in the Philippine Islands or other places beyond the limits of the continental United States. * * *

"443. Same: Violation of Regulations: Forfeiture. Any gold withheld, acquired, transported, melted or treated, imported, exported, or earmarked or held in custody, in violation of this Act (§§ 441, 442 of this title) or of any regulations issued hereunder, or licenses issued pursuant thereto, shall be forfeited to the United States, and may be seized and condemned by like proceedings as those provided by law for the forfeiture, seizure, and condemnation of property imported into the United States contrary to law; and in addition any person failing to comply with the provisions of this Act (said sections) or of any such regulations or licenses, shall be subject to a penalty equal to twice the value of the gold in respect of which such failure occurred. (Jan. 30, 1934, c. 6, § 4, 48 Stat. 340.)

\*     \*     \*     \*     \*     \*     \*

"446. Laws repealed. All Acts and parts of Acts inconsistent with any of the provisions of this Act (§§ 315b, 405b, 408a, 408b, 440 to 446, 733, 734, 752,

the 1934 measures regulate the possession of bullion. The 1933 Act gives the President emergency powers to regulate the hoarding of gold, and, pursuant to this Act, he forbade the possession of bullion without licenses. The 1934 Act authorized the Secretary of the Treasury to prescribe the conditions under which gold might be held —without limiting his power to times of war or national emergency. The 1933 Act and Order 6260 imposed criminal punishment upon wilful violators of the Order. The 1934 Act invoked only civil penalties for all violators—wilful or otherwise—of Treasury Regulations issued pursuant to it. The two measures clearly supplement one another, and the 1934 Act in no way suggests repeal of the earlier Act and Order. So the courts have held. Farber v. United States, 9 Cir., 114 F.2d 5, certiorari denied 311 U.S. 706, 61 S.Ct. 173, 85 L.Ed. 458; Ruffino v. United States, 9 Cir., 114 F.2d 696. See, also, United States v. Levy, 2 Cir., 137 F.2d 778.

■ 2. Chabot argues that the government did not prove that he knew about the gold found in his car—*i. e.*, that he did not knowingly violate the Order. His contention lacks merit. Customs agents testified that the gold was found in Chabot's car, shortly after·he himself had delivered it to the freight agent for shipping, and that he admitted after arrest, "Oh, I knew that I was carrying the gold." This was sufficient proof of his knowledge to support the

jury's verdict of guilt. The government was also required to prove, under the judge's charge, that Chabot owned the gold. Chabot, according to the agents' testimony, claimed upon arrest that he was delivering the car and its contents abroad for a mysterious "Carl."[3] The jury, however, did not have to believe all of Chabot's story to the agents; they could properly conclude there was no "Carl," and could reasonably infer ownership of the gold from the circumstances of its discovery in Chabot's possession.

■ ■ 3. Chabot's final argument for reversal is that the agents conducted an unreasonable search of his car to find the gold which was hidden behind the fenders. We think not. The car had already been delivered, along with the keys, to the freight agent; it was parked alongside the pier when the customs men began to inspect it. The right of customs officials to inspect cargo being shipped abroad at a port of embarkation is apparent. See 19 U.S.C.A. § 1581; § 379.1(e) Export Control Regulations, 15 Fed.Reg. 2725;[4] Landau v. United States Attorney for the Southern District, 2 Cir., 82 F.2d 285, 286, certiorari denied 298 U.S. 665, 56 S.Ct. 747, 80 L.Ed. 1389; The Atlantic, 2 Cir., 68 F.2d 8. Here, the car was heavily weighted down in the rear without any apparent cause. The fenders, upon tapping, sounded peculiar. The car, in such obviously bad condition, was being shipped abroad. This

753, 754a, 754b, 767, 771, 821, 822a, 822b, 824 of this title and 12.213, 411 to 415, 417, 467) are hereby repealed. Jan. 30, 1934, c. 6, § 17, 48 Stat. 344."

3. In order to constitute a violation of Order 6260 the gold unauthorizedly possessed must be owned by a "person subject to the jurisdiction of the United States." It would seem that, even if the jury believed Chabot's reported story about "Carl," he would nevertheless be guilty, for the mysterious "Carl" was, according to Chabot, located within the United States. The trial judge, here, however, charged that the government must prove to the jury's satisfaction that Chabot was the owner. We will therefore review the evidence in that context only.

4. 19 U.S.C.A. § 1581, provides in pertinent part: "Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States * * * and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, * * *."

§ 379.1(e) of the Export Control Regulations, 15 Fed.Reg. 2725, May 9, 1950, provides in pertinent part: "Collectors of Customs and all other customs officials * * * are authorized to take appropriate action to assure observance of the provisions of parts 370–399 [of the Export Control Regulations] *inclusive,* * * * *including but not limited to inspection of commodities and technical data, at any time prior to departure of the exporting carrier.*" (Emphasis supplied.)

seems to us sufficient cause to authorize a more thorough and even dismantling search of the car, for possible secret exports. See 22 U.S.C.A. § 401.[5] Both 19 U.S.C.A. § 1581 and 22 U.S.C.A. § 401 seem to dispense with the necessity of a search warrant in such circumstances.

Affirmed.

5. Section 401 provides: "Whenever an attempt is made to export or ship from or take out of the United States any arms or munitions of war, *or other articles*, in violation of law, or whenever there shall be known or probable cause to believe that any such arms or munitions of war, *or other articles*, are being or are intended to be exported, or shipped from, or taken out of the United States, in violation of law, the several collectors, comptrollers of customs, surveyors, inspectors of customs, and marshals, and deputy marshals of the United States, and every other person duly authorized for the purpose by the President, may sieze and detain * * * [such] articles or munitions of war". (Emphasis supplied.)