**UNITED STATES of America**

v.

**Bulus A. AJLOUNY aka Paul Ajlouny, Defendant.**

**No. 78 CR 491.**

United States District Court,
E. D. New York.

Sept. 24, 1979.

Edward R. Korman, U. S. Atty., by Steven G. Nelson, Asst. U. S. Atty., Eastern District of New York, Brooklyn, N. Y., for the Government.

Weil, Gotschal & Manges by John R. Wing, New York City, for defendant.

### MEMORANDUM OF DECISION AND ORDER

COSTANTINO, District Judge.

Defendant, Paul Ajlouny ("Ajlouny"), is charged in a 137 count indictment. Count One charges a violation of 18 U.S.C. § 2314. It alleges that Ajlouny transported stolen telecommunications equipment in foreign commerce. Counts Two through One Hundred Thirty-seven charge violations of 18 U.S.C. § 1343. They allege that Ajlouny used a "blue box" to make telephone calls in order to defraud the New York Telephone

Company for the use of such services. He now makes the following motions with respect to the indictment:

(1) to dismiss the indictment for a violation of the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.*;

(2) to dismiss the indictment for failing to present evidence in an unbiased way to the grand jury;

(3) to sever Count One from the remaining Counts in the indictment;

(4) to suppress the seizure of a blue box;

(5) to suppress evidence derived from illegal electronic surveillance;

(6) to suppress evidence seized from a shipping container;

(7) to suppress statements made to the Government;

and

(8) for discovery.

The court held an extensive hearing on the fourth, sixth and seventh points. The court found that an evidentiary hearing was unnecessary on the first, second, third and fifth points, but heard oral argument. The court also inspected *in camera* the minutes of the grand jury with regard to point 2, and considered additional documentation relative to point 5. The parties resolved point 8.

After considering the voluminous record before the court, the court finds that it must deny defendant's motions to sever, dismiss and suppress, on the basis of fact and law relative to those contentions. The court will now discuss the points raised, and the facts relative to each, *seriatim.*

## I. THE SPEEDY TRIAL CONTENTION

Ajlouny was arrested on April 18, 1978 pursuant to a criminal complaint filed against him. Under the then applicable Speedy Trial Plan for the Eastern District of New York ("Plan"), the Government was required to indict Ajlouny within 45 days from the date of his arrest. Plan Rule 3(a)(2). The time limit was extended for 25 days to June 27, 1978 because of a defense motion for a continuance. 18 U.S.C. § 3161(h)(8)(A). On June 26, 1978, one day prior to the expiration of the time limit, the

Government voluntarily dismissed the complaint. The Government wanted to investigate Mr. Ajlouny's actions further in order to present the evidence to a Grand Jury for a possible indictment. (Government Affidavit in Opposition). On September 5, 1978 Ajlouny was indicted.

Ajlouny contends that the delay between June 26 and September 5 violated the Plan and requires the dismissal of the indictment as a result. In *United States v. Hillegas*, 578 F.2d 453 (2d Cir. 1978), the court was faced with a similar problem and held that the time between the dismissal of the complaint and the subsequent indictment was excludable time. The court rejected the contention that the delay required the dismissal of the indictment. Since this court finds the decision in *Hillegas* to be controlling, it rejects Ajlouny's contentions. *See also* 18 U.S.C. § 3161(h)(6); Plan § 5(d)(3); Plan § 9(a)(6); *United States v. McClean*, 528 F.2d 1250 (2d Cir. 1976) (5½ month delay); *United States v. Flores*, 501 F.2d 1356 (2d Cir. 1974); *United States v. Sebastian*, 428 F.Supp. 967 (W.D.N.Y.1977), *aff'd*, 562 F.2d 211 (2d Cir. 1977). Moreover, even a technical violation of the Plan would not require a dismissal of the indictment. *See* Plan § 10(e); *United States v. Carini*, 562 F.2d 144 (2d Cir. 1977).

Ajlouny also sought a hearing to determine the reason for the Government's dismissal of the complaint. The court denied the request. Here, the Government stated that it intended to present documentary evidence to a grand jury. Based on the Assistant United States Attorney's representations, in his affidavit and in court, the court is satisfied that the Government had a good faith basis for the initial dismissal of the complaint. Under these circumstances, and in light of the clear legal rule of *Hillegas, supra,* the court found no need for a hearing on this issue. *See United States v. Elsbery*, 602 F.2d 1055 (2d Cir. 1979). Accordingly, Ajlouny's motion to dismiss the indictment is denied.

## II. THE GRAND JURY CONTENTIONS

Ajlouny contends that the Grand Jury heard inflammatory and irrelevant

references concerning his relationship to the Palestine Liberation Organization ("PLO"), and that the prejudice which resulted requires the dismissal of the indictment. In response to this claim, the court held an *in camera* inspection to determine the nature and scope of any reference to the PLO during the presentation of evidence to the Grand Jury. An examination of the minutes revealed minimal references to the PLO, which in the context of the proceedings were not inflammatory, if not completely innocuous. Moreover, according to the Government's stated theory of its case, Ajlouny's alleged connection to the PLO appears to be relevant to the Government's inquiry in any event. Since the indictment appears valid on its face, and the presentation to the grand jury was made in a good faith effort to provide material and relevant facts during the investigative stage of the proceedings, the court finds no basis for dismissing the indictment.[1] *See United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972).

■ Ajlouny also contends that the Government's failure to record the prosecutor's colloquies with the grand jury requires the dismissal of the indictment. While recording of the prosecutor's remarks may be the better practice, the failure to record is not a basis for dismissing the indictment. *United States v. Rubin,* 559 F.2d 975 (5th Cir. 1977); *United States v. Peden,* 472 F.2d 583 (2d Cir. 1973); *United States v. Greater Syracuse Bd. of Realtors, Inc.,* 449 F.Supp. 887 (N.D.N.Y.1978); *United States v. Daneals,* 370 F.Supp. 1289 (W.D.N.Y.1974).

Accordingly, the motion to dismiss on these grounds is denied.

## III. SUPPRESSION OF THE FRUITS OF ELECTRONIC SURVEILLANCE

■ Ajlouny moves to suppress any evidence derived from illegal electronic surveillance. At the court's request, the Government checked with all of its agencies to determine the existence of any electronic surveillance. The check produced negative results.[2] The court is satisfied with the representations made in court by the Assistant United States Attorney, and finds no need for a further inquiry. *See United States v. Van Orsdell,* 521 F.2d 1323 (2d Cir. 1975). Accordingly, there is no basis for defendant's motion and it must be denied.[3]

## IV. SEVERANCE

Ajlouny moves, pursuant to Fed.R. Crim.P. 8 and 14, to sever Count One from

1. At a preliminary stage in the proceedings, Judge Platt also determined that the PLO "connection" was relevant to the Grand Jury's inquiry.

2. During the course of its inquiry the Government advised the court that statements attributed to Mr. Ajlouny were recorded during the course of national security electronic surveillance. Ajlouny sought the disclosure and suppression of the recorded statements. The court reviewed the records of the surveillances *in camera,* and finds that the statements do not concern the subject matter of the indictment, and were not used to initiate the investigation concerning the crimes charged. Moreover, the court finds that there was an independent basis for the investigation of Ajlouny and the subsequent arrest.
The court is also satisfied that the *in camera* procedure used here was proper under the circumstances. The surveillance in this case was lawful, having been ordered and approved by the Attorney General to monitor what the court finds were persons, agencies and matters in-

volving *foreign* intelligence of legitimate concern to the national security. *See Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969) (production required for *illegal* surveillance); *United States v. Buck,* 548 F.2d 871 (9th Cir. 1977); *United States v. Butenko,* 494 F.2d 593 (3rd Cir. 1974), *cert. denied,* 419 U.S. 881, 95 S.Ct. 147, 42 L.Ed.2d 121 (1974); *United States v. Brown,* 484 F.2d 418 (5th Cir. 1973), *cert. denied,* 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1973).
Since the court finds that the statements were lawfully recorded during the course of legitimate national security electronic surveillance, there is no basis for disclosing and suppressing the statements. *See* 18 U.S.C. § 2511(3).

3. Employees of the New York Telephone Company installed a pen register device to record the numbers of the calls made by Ajlouny. Any challenge to the validity of the pen register is precluded by *Smith v. Maryland,* —— U.S. ——, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979).

the remaining counts of the indictment. He contends that the stolen property count is unrelated to the blue box counts, and that the joint trial of those counts will severely prejudice his right to a fair trial.

The Government contends that these allegations must fail in light of its theory of the case. It claims that the stolen property count and the blue box counts were properly joined because they represent transactions constituting a common scheme or plan under Fed.R.Crim.P. 8. *See United States v. Halper*, 590 F.2d 422 (2d Cir. 1978). Specifically, the Government contends that it will seek to prove that the stolen communications equipment was stolen as part of a scheme to aid the PLO in establishing a telecommunications system. It further contends that the blue box counts relate to this scheme because some of the phone calls listed in those counts were placed to locations in the Middle East having a connection to the stolen property count. The communications equipment was being shipped to the Ocean Trading Company in Qatar. It was listed as being air conditioning equipment, and not communications equipment. Ajlouny allegedly called both the PLO headquarters in the Middle East and the Ocean Trading Company with the aid of the blue box. From these and other factors more fully presented in the record before the court, the Government alleges that the connection between the two sets of counts is clear.

■ The court finds that there is a logical connection between Count One and the remaining counts. The Government's contentions amply demonstrate the inferences and evidence connecting the crimes. It is not speculative to attempt to show that Ajlouny's purpose in making the blue box calls was to facilitate the theft and shipments of the communications equipment. If the Government's theory is correct, and supported by proof at trial, then it is clear that the plan for the theft and shipment of stolen property would be accomplished qui-

etly. Thus, it would be logical to conclude that the clandestine blue box calls were an appropriate vehicle for facilitating the plan. Significantly, the container was destined for the Ocean Trading Company in Qatar— an address which the Government contends is traceable through one of the phone calls placed by Ajlouny on the blue box. Thus, the testimony relating to the blue box calls will have a logical bearing on the proof in the stolen property count. The link between the phone call and the destination of the shipment will most likely have some bearing on Ajlouny's knowledge of the transactions. While the court is not attempting to judge the strength of the Government's case, for the purposes of this motion it appears both efficient and economic to try the counts together. Accordingly, severance is unwarranted in light of the facts presented to the court.[4]

### V. THE SEARCH OF THE CARGO CONTAINER

Ajlouny also contends that the search of his cargo container on a pier was unconstitutional. He moves to suppress the fruits of the search during the subsequent seizure. The court held a hearing to clarify the surrounding circumstances of that search, and finds that there was no violation of the defendant's rights.

On April 17, 1978 agents of the United States Customs Service, headed by Agent Stephen Rogers, conducted a search of a cargo container on Pier 9A in Brooklyn, New York. The container was in the possession of the shipping company and was scheduled for loading that day on a ship destined for Doha, Qatar. The container's location was considered to be a customs control area. Once at the pier, the agents acquired the dock receipt for the container, and removed the container to the far end of the pier. The dock receipt indicated that the container was loaded with air conditioning equipment. Upon breaking the seal and opening the doors, the agents found

---

**4.** Ajlouny relies primarily on *United States v. Halper*, 590 F.2d 422 (2d Cir. 1978) to support his position. Although *Halper* presents an ex-

cellent discourse on the law of joinder, the facts in that case distinguish it from the case presented to the court.

large cartons intermixed with other items. Closer examination revealed that the cartons contained telephone communications equipment. The agents contacted representatives of the Telephone Company who identified the equipment as theirs. The equipment was removed from the pier by the agents.

Prior to the April 17, 1978 search, the agents had placed Ajlouny under surveillance for possible violations of federal munitions laws. During the course of that surveillance, they observed Ajlouny apparently supervising the loading of the container at a store located in a shopping center near Ajlouny's home. The agents testified that because the container was flush with the wall, and because of their fear of being noticed, they were unable to verify the contents of the container. Agent Rogers, however, had information prior to the April 17 search which he believed *in toto* would establish that Ajlouny was illegally shipping munitions in the container. He based this conclusion on information which he received for a month prior to April 17. Rogers knew that Ajlouny was affiliated with the Palestine Liberation Organization, which he classified as a terrorist organization. He knew that Ajlouny was licensed to carry a weapon and had information concerning a weapons violation by Ajlouny. He was told by Telephone Company representatives that Ajlouny was making blue box calls to Russia, the PLO and other Middle East locations. He was also told that Ajlouny was monitoring the fighting in the Middle East. Moreover, when Ajlouny was confronted with the blue box allegations by representatives for the Telephone Company, he indicated that if the Telephone Company's investigation continued people in the United States and Israel could be killed. When Rogers further learned that the destination of the container was Qatar in the Middle East he believed a search for munitions was in order. The April 17 search followed.[5]

Ajlouny contends that a warrantless export search based on less than probable cause is improper and requires the suppression of the seized equipment. The Government concedes that the search was conducted without a warrant and without probable cause. However, it argues that an export search in a customs area, like an import search, is proper even in the absence of a warrant and probable cause.

■ It is well settled that warrantless import searches based on less than probable cause are proper. *United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977); *United States v. Glaziou*, 402 F.2d 8 (2d Cir. 1968), *cert. denied*, 393 U.S. 1121, 89 S.Ct. 999, 22 L.Ed.2d 126 (1969). Thus, a reasonable suspicion by customs officials that illegal activity is possible is a sufficient basis to stop and search. *United States v. Asbury*, 586 F.2d 973, 975–76 (2d Cir. 1978); *United States v. Glaziou, supra* at 12. Nonetheless, this relaxed standard for stopping and searching is qualified by the requirement of reasonableness. *United States v. Asbury, supra* at 976. The determination of reasonableness depends upon the facts of each particular case. *United States v. Absury, supra* at 976; *United States v. Glaziou, supra* at 12.

The issue posed by this case is whether the import search standards apply equally to an export search. An affirmative response indicates that an export search may be had without a warrant and without probable cause.

■ The resolution of the question before the court centers around *United States v. Swarovski*, 592 F.2d 131 (2d Cir. 1979). *Swarovski* followed *United States v. Asbury*, 586 F.2d 973 (2d Cir. 1978). In *Asbury* the court discussed the standards applicable to border "strip" searches. *Asbury* involved an import search. Yet, the court noted that "anyone *entering or leaving* the country may expect to have his luggage and

---

5. On April 17, 1978 Agent Rogers' suspicion was apparently further aroused by the fact that the shipping documents indicated that Ajlouny was shipping air conditioning equipment. Rog-

ers knew that Ajlouny worked for a professional cleaning corporation and had no known relationship with air conditioners.

personal effects examined" if the customs officers' decision to search was based on reasonable suspicion. *Id.* at 975 (emphasis added). Thus, the court equated an import search with an export search. Following that lead, the court in *Swarovski* held that the warrantless border search of luggage during departure from the country was proper. 592 F.2d at 133. Thus, it is clear that a warrantless export search is proper.

The next inquiry is whether the warrantless export search requires probable cause. In *Swarovski* the court held:

> Appellant's contention that customs officials can make such a search only when the person whose effects are being searched is entering the United States is not the law. *See* 22 U.S.C. § 401(a); *California Bankers Ass'n v. Shultz,* 416 U.S. 21, 63, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974); *United States v. Chabot,* 193 F.2d 287, 290 (2d Cir. 1951); *United States v. Stanley,* 545 F.2d 661, 667 (9th Cir. 1976), *cert. denied,* 436 U.S. 917, 98 S.Ct. 2261, 56 L.Ed.2d 757 (1978); *Samora v. United States,* 406 F.2d 1095, 1098–99 (5th Cir. 1969).

 This terse statement of law leads this court to conclude that the Court of Appeals approved not only warrantless export searches, but also export searches based on less than probable cause. Two factors support that conclusion. First, the Government's appellate brief in the Court of Appeals raised the issue of probable cause in the context of an export search. The district court in *Swarovski* made a finding of probable cause, and the Government's brief appears to be in line with that position.[6] However, the Assistant United States Attorney informed this court that United States Attorney Korman specifically argued in *Swarovski* that since import and export searches are equivalent, neither requires probable cause. Thus, while the decision in *Swarovski* does not elaborate on this issue, it is clear that the question of probable cause was placed before the court.

The second, and more significant, factor is the court's citation with approval to two decisions, *United States v. Chabot,* 193 F.2d 287 (2d Cir. 1951) and *United States v. Stanley,* 545 F.2d 661 (9th Cir. 1976), *cert. denied,* 436 U.S. 917, 98 S.Ct. 2261, 56 L.Ed.2d 757 (1978).[7] In *Chabot,* the defendants challenged the warrantless export search conducted by customs officers at a pier. The court sustained the warrantless search and seizure and held:

> The car had already been delivered, along with the keys, to the freight agent; it was parked alongside the pier when the customs men began to inspect it. The right of customs officials to inspect cargo being shipped abroad at a port of embarkation is apparent . . . (citations omitted) Here, the car was heavily weighted down in the rear without any apparent cause. The fenders, upon tapping, sounded peculiar. The car, in such obviously bad condition, was being shipped abroad. This seems to us *sufficient cause* to authorize a more thorough and even dismantling search of the car, for *possible secret exports. See* 22 U.S.C.A. § 401. Both 19 U.S.C.A. § 1581 and 22 U.S.C.A. § 401 seem to dispense with the necessity of a search warrant in such circumstances. *Id.* at 290–91 (emphasis added).

Congress required a showing of probable cause to justify the search and seizure. Similarly, *Samora v. United States,* 406 F.2d 1095 (5th Cir. 1969) involved a seizure under 22 U.S.C. § 401(a) after a finding of probable cause.

Ajlouny has stressed the significance of this melange of cases cited by the court. While there is some merit to his argument concerning those citations which were based on probable cause, the discussion of *Chabot* and *Stanley, supra* will indicate the impact of those cases on the determination here.

---

6. The brief was submitted to this court during oral argument.

7. The remaining citations must be construed as standing for the proposition that Congress may specifically regulate export searches and establish standards for enforcement. Thus, in *California Bankers Ass'n v. Shultz,* 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1978), the court approved regulations, concerning foreign banking transactions. Moreover, 22 U.S.C. § 401(a) authorizes the seizure of munitions and war materials exported without a license. There,

While this court is reluctant to assume that the court in *Chabot* intended to rely on a standard less than probable cause, it appears from the facts of that case, elicited above, that probable cause did not exist to make a search for illegally exported bullion. Moreover, the language of the court in reaching that decision seems to emphasize a standard more relaxed than that of probable cause. Indeed, the court was apparently willing to uphold a warrantless search for "*possible*" violations of law. *Id.*

Were *Chabot* the only peg upon which to hang a rule of law, this court may have appeared pressed to justify its conclusion. Yet, *Chabot's* ramifications are bolstered by the holding in *United States v. Stanley, supra.* In *Stanley*, the court sustained a lower court finding of no probable cause for an export search. However, it reversed the lower court's holding concerning a border search. Aware of the novel situation posed the court noted:

> No case has been found where the constitutionality of a search was premised on the border search exception in the context of one being stopped and searched while leaving the United States. That is the situation here. *Id.* at 665–66.

The court discussed the law of import searches and their constitutionality. Seeing a clear and compelling analogy between import and export searches, it held that the two are equal under the Fourth Amendment. Accordingly, it sustained a warrantless export search based on less than probable cause.

Since the court in *Swarovski* cited both *Chabot* and *Stanley* with approval, this court must assume that the Court of Appeals approved of the holdings in those cases. Moreover, this court is satisfied that an export search is equivalent to an import search. It would be anomalous to allow the sovereign to protect its borders only against incoming dangers, while foreclosing the use of similar precautions for sensitive and dangerous materials being illegally exported. *See, e. g., United States v. Swarovski, supra.* Accordingly, this court finds on the basis of the discussion above that a warrantless export search without probable cause in a customs area is proper.

▮ Having found that an export search and import search derive from the same basis, the court must determine whether there was a reasonable suspicion to conduct the export search in this case. It is apparent from the factors enumerated above that Agent Rogers had a justifiable suspicion for ordering the search of the container. From the information he had received prior to ordering the search Rogers could reasonably suspect that Ajlouny may attempt to violate munitions export laws. Moreover, once at the pier, Rogers' suspicion may have been heightened by the dock receipt which listed air conditioning equipment as cargo. Rogers knew from his investigation that Ajlouny had no apparent contact with air conditioning equipment, and so could properly suspect that a violation would occur. Finally, once the container had been placed on the pier for shipment overseas, Rogers could reasonably believe that Ajlouny intended to export its contents. It is also significant that the cargo destination was the Middle East, "an area of the world in which there is continuing armed conflict." *United States v. Keuylian,* 602 F.2d 1033 at 1043 (2d Cir. 1979).

Moreover, Rogers satisfied his suspicion in a reasonable manner. The container was to be loaded on the ship that day. His failure to act would have unduly complicated matters. His decision to remove the container and search it on the pier prior to loading was a reasonable exercise of his customs duties. Accordingly, the warrantless export search of the container was proper.

▮ Ajlouny contends, however, that the seized contents of the container must be suppressed because the customs officers failed to procure the Shipper's Export Declaration prior to beginning their search. Testimony at the hearing indicated that the agents possessed only the dock receipt when the search occurred. The shipping packet, which contained numerous documents, including the export declaration, was in the possession of the freight forwarding agent

located at the World Trade Center in Manhattan. Rogers directed one of the other officers to pick up the packet. Thus, it was not retrieved until after the search commenced, and in fact was brought to the pier later in the operation.

Ajlouny's contention needs only a short discussion. The procedures used by the customs officers were conducted within the general regulations for export clearance. See 15 C.F.R. § 386 et seq. Even if the agents violated the regulations, it is clear that the violation was merely technical. The agents had retrieved the shipping packet later in the day. Thus, the search would have merely been delayed and not foreclosed. Moreover, the violation of agency regulations alone is not a basis for suppression. *United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979).

Accordingly, for all these reasons, the motion to suppress the contents of the container is denied.

## VI. SUPPRESSION OF THE BLUE BOX [8]

Ajlouny further contends that the seizure of a blue box from a briefcase at the time of his arrest was improper. The Government argues that the blue box was seized incident to a lawful arrest. Based on the facts at the hearing, the court finds that the blue box was seized contemporaneous with an arrest based on probable cause.

■ After having searched the container on Pier 9A, and having found stolen telecommunication equipment, the customs agents procured a warrant for Mr. Ajlouny's arrest.[9] On April 18, 1979 the agents went to Ajlouny's residence in Hempstead, New York to execute the war-

rant. Prior to arriving at Ajlouny's home, Agent Rogers briefed the other agents and state police officers [10] on the procedure to follow. Rogers informed the other agents and officers that Ajlouny was licensed to carry a gun and that it was likely that he would have a gun at the time of the arrest. As a precautionary measure, Rogers decided to make the arrest after Ajlouny left his house. Agent Rogers indicated that searching for a blue box was not discussed. The officers and agents thereupon stationed themselves around the Ajlouny home at approximately 8:00 a. m.

At sometime between 8:05 a. m. and 8:15 a. m. Ajlouny was observed leaving the side entrance of his home and entering his car parked in the driveway. The agents and officers converged upon the scene, and blocked the driveway. Rogers approached Ajlouny on the driver's side of the car and informed Ajlouny that he was being placed under arrest. The driver's door was open. Upon approaching Ajlouny, Rogers placed his left hand upon Ajlouny's left hand on the steering wheel. In response to Rogers' inquiry concerning a weapon, Ajlouny indicated that he had a gun on his left side. Rogers recovered the gun and began to move Ajlouny out of the car.

Simultaneously, the other officers and agents moved around the car. Agent Mulcahy went along the passenger side toward the front of the car. Agent Woodworth moved toward the front door on the passenger side. As the activity between Rogers and Ajlouny continued, Woodworth, upon his arrival, opened the passenger door, leaned into the car and began to search in and around the front seat for weapons. A leather briefcase was in the middle of the

---

**8.** Simply explained, a blue box is an electronic device used to bypass ordinary telephonic payment recording procedures. It is clipped to a telephone and enables the user to avoid charges for the telephone calls made. See 34 A.L.R.Fed. 278.

**9.** Ajlouny does not contend, for these purposes, that the arrest was made without probable cause, although such an argument would flow from the suppression of the contents of the container. Having found that the items in the

container were lawfully seized, this court has a sufficient basis for a finding of probable cause to make the arrest. Here, once the agents were informed that the communications equipment found in the container was stolen, they had probable cause to arrest Ajlouny.

**10.** The state police officers were present as a result of their investigation into Ajlouny's use of a blue box.

front seat. Woodworth lifted the cover of the briefcase, and noticed wires, "filament from a telephone" (Tr. 172) and a calculator-type object in a small leather case. He did not find a weapon. His actions were contemporaneous with Ajlouny's movement out of the car.[11]

Immediately after searching the front Woodworth exited the car and asked one of the agents if the gun was recovered. He then conversed with a state police officer at the scene who did not participate in the arrest or weapons search.[12] The officer inquired as to the existence of a blue box, and described it. Woodworth indicated that based on his examination of the calculator case [13] and wires he believed the briefcase contained such a device. The blue box was then seized by the state officer.

Both Ajlouny and the Government concede that the validity of the search and seizure must be judged according to the standards enunciated in *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) for a search incident to the arrest. Under *Chimel*, an officer is justified in making a contemporaneous search for a weapon in order to protect his person. That search may encompass not only the body of the arrested person but also the grabbable area within the immediate control of the arrested person. *Id.* at 762–3, 89 S.Ct. 2034. It is equally well settled that a "search can be incident to an arrest only if it is substantially contemporaneous with the arrest and is confined to the immediate vicinity of the arrest." *Stoner v. California*, 376 U.S. 483, 486, 84 S.Ct. 889, 891, 11 L.Ed.2d 856 (1964). *See also Shipley v. California*, 395 U.S. 818, 89 S.Ct. 2053, 23 L.Ed.2d 732 (1969).

Given the facts established at the hearing, it is clear that the search of the briefcase was incident to the arrest. Woodworth's actions occurred at the same time as Ajlouny's motion up from and out of the car. Ajlouny was restrained by Rogers' left hand only, leaving Ajlouny's right hand free within a few feet of the briefcase on the front seat. Thus, Ajlouny, a man of physical characteristics commensurate with those of Rogers, was not so restrained that the area within the front seat of the car was outside his effective control.[14] *See, e. g., United States v. Regan*, 525 F.2d 1151, 1155 n.3 (2d Cir. 1975) (heroin found in motorcycle helmet on front seat of car). Moreover, the court is satisfied that Ajlouny was handcuffed only after he was removed from the immediate area of the front seat, and brought to the front of the car, and therefore was capable of reaching into the car while sitting in the seat and standing with Rogers. *See, e. g. United States v. Mason*, 173 U.S.App.D.C. 173, 523 F.2d 1122 (D.C.Cir. 1975) (handcuffed man capable of reaching weapon three to four feet away in a closet). The court is also satisfied that the briefcase was unlatched at the time Woodworth conducted his search,[15] and was therefore a proper object for a search. *See also United States v. Fairfield*, 526 F.2d 8 (8th Cir. 1975) (search of car for weapons after defendant's arrest outside of car). The briefcase was not within the exclusive control of the officers

---

11. Woodworth's actions consumed approximately thirty seconds to one minute. Roger's initial movement with Ajlouny out of the car lasted slightly less than one minute.

12. This conversation occurred less than a minute after Woodworth's exit.

13. Woodworth picked up the case and handled it for a few seconds, satisfied that it did not contain a weapon, he returned it to the position in the case.

14. It may be noted that the car, a Cadillac, would most likely have allowed relatively easy access to the front seat.

15. Ajlouny testified that he left his house with the briefcase latched, and did not unlatch it after entering the car. However, Woodworth indicated that he did not unlatch the briefcase and only lifted the top. He stated that he handled the calculator case for a few seconds. O'Donnell indicated that the case was propped open by papers jammed around the edges of the case. Given this discrepancy, the court is faced with a clear issue of credibility, and is satisfied that the case was unlatched on the front seat of the car. Similarly, the issue as to whether the passenger door was unlocked is resolved affirmatively.

**1006**

at the time of the search. *Compare United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). Finally, the fact that the weapons search revealed a blue box that gave rise to probable cause for its seizure for another crime, is not a basis for suppressing the seized item. *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). Accordingly, the blue box was properly seized incident to Ajlouny's arrest, and the motion to suppress must be denied.[16]

## VII. SEARCH OF DEFENDANT'S HOME

■ Ajlouny summarily argues that the fruits of the search of his home and business must be suppressed because he did not voluntarily consent to the search.[17] The court finds that Ajlouny voluntarily and knowingly consented to the searches subsequent to his arrest. The testimony at the hearing satisfied the court that Ajlouny was properly informed of his constitutional rights and volunteered information and cooperated with the agents. Moreover, there is no indication that the agents induced that cooperation by threats or promises. Accordingly, the contention is without substance and the motion is denied.

## VIII. POST–ARREST STATEMENTS

Ajlouny's final contention concerns statements made to an Assistant United States Attorney (AUSA) after arrest but before arraignment by a United States Magistrate. Ajlouny contends that the period of time between arrest and arraignment constituted unnecessary delay under 18 U.S.C. § 3501 and Fed.R.Crim.P. 5(a) requiring the

suppression of any statements made by him to the AUSA. The government rejects Ajlouny's rendition of the facts and argues that the delay between arrest and arraignment was reasonable and justified.

■ The question before the court is whether the statements were made under circumstances which would indicate that Ajlouny's will to resist was broken by a delay of approximately seven hours. *See United States v. Reed*, 572 F.2d 412, 426 (2d Cir. 1978). Under 18 U.S.C. § 3501(b) several factors are listed to guide the court in its determination of voluntariness. These factors include the amount of time which elapsed, the defendant's knowledge of the charges, the defendant's awareness of his right to remain silent and of his right to counsel, and the presence or absence of an attorney. 18 U.S.C. § 3501(b).

Here, the focus of the inquiry centers around the amount of time which elapsed between the arrest and arraignment, and the manner in which that time elapsed. Ajlouny was arrested at approximately 8:00 a. m.[18] and arraigned at approximately 3:30 p. m. of that day, a maximum period of seven and one-half hours. The arrest period took approximately five to ten minutes before the defendant was placed in the car and driven from his home. During that time the defendant was informed of his right to remain silent, of his right to an attorney and of the right of the Government to use any statements made by him. Ajlouny was placed in the government vehicle and brought to a McDonald's restaurant, and offered coffee and breakfast. During the time at McDonald's, Ajlouny and the

**16.** Ajlouny also contended that the customs officers had no authority to make the arrest. The court finds that the arrest was proper. *See* 26 U.S.C. § 7607(1); *United States v. Swarovski*, 557 F.2d 40 (2d Cir. 1977).

Ajlouny also questions the validity of the arrest warrant. He claims that Rogers' complaint was made in bad faith and contained intentional misrepresentations of material facts. The court finds that Rogers acted in good faith in making the complaint. When the telephone equipment was found in the container, the Telephone Company was contacted concerning the equipment. The information received from

the representatives of the Telephone Company was a sufficient, good faith basis for Rogers' affidavit.

**17.** The Government concedes that Ajlouny did not consent to a search of his bedroom and will not offer any evidence seized from the bedroom.

**18.** While the agents indicated that the arrest took place between 8:00 a.m. and 8:15 a.m., Mr. and Mrs. Ajlouny stated that the arrest occurred between 8:30 a.m. and 8:45 a.m.

agents engaged in a conversation and Ajlouny was informed of the nature of the charges against him. During that time, Ajlouny consented to a search of his premises. Ajlouny thereupon executed a written consent to a search of his home and business. The agents and Ajlouny returned to Ajlouny's home. A search of the Ajlouny home and business ensued. The elapsed time between the arrest and the second departure was approximately three hours. One hour was spent at the McDonald's restaurant.

The party left the Ajlouny home for the World Trade Center at approximately 11:30 a. m. The trip from Hempstead on Long Island to the World Trade Center in lower Manhattan took until approximately 12:30 p. m. At the World Trade Center offices of the Customs agents, Ajlouny was processed routinely and offered lunch. During this period at the World Trade Center Ajlouny discussed his PLO affiliation and relationship to the Middle East.

After processing at the World Trade Center Ajlouny was transported to the federal courthouse in Brooklyn for arraignment. He arrived with the agents at approximately 1:40 p. m. Upon arrival, he was first taken to AUSA Mansfield's office and introduced to AUSA Mansfield. Shortly thereafter, Mansfield informed Ajlouny of his constitutional rights and conducted an interview for approximately 20 minutes concerning the charges against Ajlouny. Ajlouny was then brought to the United States Marshal's office in the courthouse building for further routine processing. No further questioning of Ajlouny occurred after that time concerning the charges. Ajlouny was arraigned before a Magistrate at 3:30 p. m., approximately one and one half hours after the Mansfield interview. This additional time between the interview and arraignment was largely a result of the processing by the Marshal, and a delay because of courtroom conditions before the Magistrate.

Given these facts, the court finds that Ajlouny voluntarily cooperated with both the agents and AUSA Mansfield. It is clear that he was sufficiently apprised of his constitutional rights at crucial points during this period and he indicated his understanding of those rights. There is no indication that the agents subjected him to coercive or dilatory tactics solely to elicit incriminating statements. Rather, the facts before the court indicate that Ajlouny was treated in a courteous manner by the agents. The mere fact that Ajlouny was willing to aid the officers in their investigation is not a basis for finding unnecessary delay, especially in light of Ajlouny's knowledgeable consent. *See e. g. United States v. Vita*, 294 F.2d 524 (2d Cir. 1961), *cert. denied*, 369 U.S. 823, 82 S.Ct. 837, 7 L.Ed.2d 788 (1962). Furthermore, the need for transportation and processing was a reasonable justification for the time spent in those activities. Thus, given the circumstances of the case, the court is satisfied that the time between arrest and arraignment was not a period of unreasonable delay which caused the defendant to make involuntary incriminating statements. *See United States v. Shoemaker*, 542 F.2d 561 (10th Cir. 1976) (13 hours delay not unreasonable under circumstances); *United States v. Ortega*, 471 F.2d 1350 (2d Cir. 1972) (11 hour delay not unreasonable); *United States v. Collins*, 462 F.2d 792 (2d Cir. 1972) (26 hour delay not unreasonable); *United States v. Marrero*, 450 F.2d 373 (2d Cir. 1971) (more than 6 hours not *per se* unreasonable).[19] Accordingly, the motion to suppress the statements made to AUSA Mansfield is denied.

## CONCLUSION

The court finds that the contentions raised by the defendant are not supported by the facts and law of this case. Accordingly, the numerous motions raised by him must be denied.

---

**19.** The defendant based his argument partially on the concurring opinion of Judge Friendly in *Marrero* concerning the interrogation by an AUSA. (Tr. 540, Direct Examination of Mans-field) However, in *United States v. Ortega*, supra, Judge Medina expressed his disagreement with Judge Friendly's view of the law. 471 F.2d at 162.